UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 01-983(DSD/JMM)

Advanced Communication Design, Inc.,

Plaintiff,

v.

**ORDER**

Premier Retail Networks, Inc.,

Defendant.

John B. Lunseth II, Esq., Gerald E. Helget, Esq. and Briggs & Morgan, 2400 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402, counsel for plaintiff.

James A. DiBoise, Esq., David J. Berger, Esq., Tracy T. Lane, Esq., Ian D. Chowdhury, Esq. and Wilson, Sonsini, Goodrich & Rosati, 650 Page Mill Road, Palo Alto, CA 94304 and David P. Pearson, Esq., Winthrop & Weinstine, 3200 Minnesota World Trace Center, 30 East 7th Street, St. Paul, MN 55101, counsel for defendant.

This matter is before the court on plaintiff's motion for a partial default judgment, plaintiff's motion for a preliminary injunction, defendant's motion for relief from default, defendant's motion for leave to file an answer and counterclaim and plaintiff's motion to strike defendant's answer and counterclaim. Based upon a review of the file, record and proceedings herein, and for the reasons stated, the court grants plaintiff's motion for partial

FILED 2-21-02
RICHARD D. SLETTEN, CLERK
Judgment Ent'd. ____________
Deputy Clerk's Initials ______

default judgment, grants plaintiff's motion for a preliminary injunction, denies defendant's motion for relief from default, denies defendant's motion for leave to file an answer and counterclaim and grants plaintiff's motion to strike defendant's answer and counterclaim.

## BACKGROUND

Plaintiff Advanced Design Communication, Inc. ("Advanced") is the owner of United States Patent No. 6,133,908 ("the '908 patent" or "patent '908"). Advanced manufactures, advertises and sells the technology and apparatus set forth in the '908 patent ("A/V Preview Apparatus") to various retailers. Advanced's A/V Preview Apparatus is designed to permit a number of consumers to simultaneously preview samples of different video or audio discs. A retail consumer who is interested in purchasing a certain audio/visual product (e.g., a movie, cassette, music video, compact disc or video game) can remove the product from the retailer's display shelf, scan the bar code on the product into the A/V Preview Apparatus and watch and listen to samples of the audio/visual retail product on the A/V Preview Apparatus. (Scibora Aff. at ¶ 6.)

Advanced alleges that defendant Premier Retail Networks, Inc. ("Premier") has produced a product, known as the "Interactive Network," that infringes upon claim 1 of the '908 patent. On

February 15, 2001, Advanced's CEO Marco Scibora sent a letter to Charles Nooney, then Premier's President, advising him that Premier was infringing upon the '908 patent. (Scibora Supp. Aff. at ¶ 4.) On March 7, 2001, Jeffrey Cohen, then Premier's Chief Executive Officer, called Scibora to talk about the letter. (Scibora Supp. Aff. at ¶ 5). Cohen and Scibora discussed resolving the dispute without litigation. (Id.) On April 9, 2001, representatives of Premier and Advanced held a telephone conference so that Advanced could learn more about Premier's product. Sean Moran and Paul Davis, of the Wilson Sonsini law firm, represented Premier.

On April 12, 2001, Scibora met with Cohen and Moran to discuss a potential business resolution of the dispute. (Scibora Supp. Aff. at ¶ 17.) Advanced alleges that Scibora told Cohen that he would consider an agreement releasing Premier from any claims of infringement if, and only if, Premier and Advanced were able to reach a "viable and beneficial business resolution." (Id.) Advanced asserts that Scibora and Cohen shook hands upon that understanding (id.), while Premier contends that the parties shook hands upon Cohen's promise to refrain from suing Premier on the '908 patent (Cohen Aff. at ¶ 3; Moran Aff. at ¶ 6).

On April 20, 2001, Gerald E. Helget and Nelson R. Capes, as patent counsel for Advanced, together with Scibora, telephoned Moran and Davis, Premier's attorney, to determine the structure and function of Premier's Interactive Network. (Helget Aff., ¶ 2;

Scibora Aff., ¶11.) From this telephone conversation Advanced determined that Premier's Interactive Network infringed upon claim 1 of the '908 patent.

On May 3, 2001, Helget, representing Advanced, delivered a letter to Davis that provided a written description of Premier's alleged infringement and that offered to resolve the dispute amicably. Neither Advanced nor Helget received a response to the letter. (Helget Aff. ¶¶ 6-7.) Helget subsequently called Davis but Davis never returned Helget's telephone call. (Id.) On June 21, 2001, Michael M. Lafeber, an attorney for Advanced, wrote a letter to Davis requesting a response to the May 3, 2001 letter. Neither Davis nor anyone from Premier responded to Lafeber's letter. (Lafeber Aff. at ¶ 8.)

Previously, on June 1, 2001, counsel for Advanced filed but did not serve a complaint with the United States District Court for the District of Minnesota alleging that Premier infringed upon the '908 patent. Art Songey, Premier's Chief Financial Officer, received notice of the filing from a law firm solicitation letter dated June 12, 2001. (Lunseth Aff., Ex. C, Songey Dep. at 18) On August 7, 2001, Scibora wrote a letter to Cohen advising him that Advanced had filed a complaint and that Premier's attorney had not responded to communication from Advanced's counsel. (Scibora Supp.

Aff. at ¶ 26; see Scibora Supp. Aff., Ex. H.) Scibora notified Cohen that Advanced would proceed with the litigation if Premier did not respond by August 16, 2001. (Id.)

Premier was served with the summons and complaint on August 21, 2001. Premier failed to submit an answer or otherwise defend or appear in this action by the time required under Rule 12 of the Federal Rules of Civil Procedure. On September 25, 2001, Advanced's attorneys contacted attorney Davis at Wilson Sonsini to inquire whether Premier would file an answer and told Davis that the answer was overdue. (Lafeber Aff. at ¶ 6.) Davis stated that he knew that the complaint had been filed but did not say whether Premier would respond. (Id.)

Advanced subsequently applied to the district court clerk for an entry of default pursuant to Fed. R. Civ. P. 55(a), which was entered on September 26, 2001. (Id. at ¶ 7.) Advanced now moves for partial default judgment, for a preliminary injunction, and to strike defendant's answer and counterclaim. Premier moves for relief from default and for leave to file an answer and counterclaim. The court grants plaintiff's motion for partial default judgment, grants plaintiff's motion for a preliminary injunction, denies defendant's motion for relief from default, denies defendant's motion for leave to file an answer and counterclaim and grants plaintiff's motion to strike defendant's answer and counterclaim.

## DISCUSSION

### I. Default Judgment

Defendant requests that the court set aside the entry of default pursuant to Federal Rule of Civil Procedure 55(c), while plaintiff requests that the court enter default judgment pursuant to Federal Rule of Civil Procedure 55(b)(2). The court denies defendant's motion and grants plaintiff's motion.

#### A. Defendant's Rule 55(c) Motion for Relief from Entry of Default.

While courts generally disfavor the entry of default, defaults serve important public policy interests:

> Both the default entry and judgment play an important role in the maintenance of an orderly, efficient judicial system. They are significant weapons for enforcing compliance with the rules of procedure and therefore facilitate the speedy determination of litigation. The default procedure offers a useful remedy to a good faith litigant who is confronted by an obstructionist adversary.... [I]f default is to be an effective sanction, relief under Rule 55(c) cannot be granted too readily.

Wright, Miller and Kane, Federal Practice and Procedure, §2693 (West Group 1998); see also Gray v. John Jovino Co., 84 F.R.D. 46, 47 (E.D. Tenn. 1979). The court has discretion in granting a motion for relief from entry of default. See Wright, Miller, and Kane, Federal Practice and Procedure at §2693.

Federal Rule of Civil Procedure 55(c) provides that a court may grant relief from entry of default for "good cause shown." The

principle factors in determining whether to grant relief from entry of default under the "good cause" standard include (1) whether the default was the result of defendant's culpable conduct, (2) whether plaintiff would be prejudiced if the default is set aside and (3) whether defendant presented a meritorious defense. In re Dierschke, 975 F.2d 181, 183 (5th Cir. 1992); Farnese v. Bagnasco, 687 F.2d 761, 764 (3d Cir. 1982); Porter v. Brancato, 171 F.R.D. 303, 304 (D. Kan. 1997); Hunt v. Kling Motor Co., 841 F. Supp. 1098, 1105-06 (D. Kan. 1993). The court need not consider all three factors. Porter, 841 F.R.D. at 304. If the default is the result of defendant's culpable conduct, then the district court may refuse to set aside the default on that basis alone. See, e.g., id.; In re Dierschke, 975 F.2d at 184; Alan Neuman Prods., Inc. v. Albright, 862 F.2d 1388, 1392 (9th Cir. 1988).

Courts consistently deny relief from a default when the default results from the defendant's willful, intentional conduct. See, e.g., Porter, 171 F.R.D. at 304 (denying relief from default because of defendant's culpable conduct); Hunt v. Kling Motor Co., 841 F. Supp. 1098, 1106 (D. Kan. 1993)(denying relief from default, emphasizing that "[i]f the default was the result of culpable conduct on the part of the defendant, the court need not consider anything else in refusing to set aside the default judgment."); Bentley v. Raveh, 151 F.R.D. 515, 519 (D. Conn. 1993)(denying relief from default because defendant "deliberately and brazenly

ignored" the litigation.); Standard Chartered Bank v. Red Rock Commodities LTD, 151 F.R.D. 261, 262 (S.D.N.Y. 1993)(denying relief from default where defendant's actions were willful); Clee v. Remillard Building, Inc., 649 F. Supp. 1127, 1130 (D. Conn. 1986)(denying relief from default where corporation's president offered no reason for delay after being served and where he was given opportunity but failed to oppose the entry of default); Admiral Home Appliances v. Tenavision, Inc., 585 F. Supp. 14, 16 (D.N.J. 1982)(denying relief from entry of default where defendant corporation was on full notice of service of summons and complaint and its failure to submit papers to attorneys for timely reply was result of arrogance and disregard for potential consequences); Paramount Packaging Corp. v. H.B. Fuller Co., 190 F. Supp. 178, 180 (E.D. Pa. 1960)(denying relief from entry of default and holding that "[a] defendant who chooses to ignore a purported service of process does so at his own risk."); Draisner v. Liss Realty Co., 211 F.2d 808, 808-09 (D.C. Cir. 1954)(denying relief from entry of default because of defendant's willful conduct).

Here, Premier's conduct establishes a pattern of willfully ignoring communication from Advanced regarding Premier's alleged infringement of the '908 patent. Premier clearly knew that Advanced had filed the summons and complaint. Premier was personally served with the summons and complaint on August 21, 2001. (See Lafeber Aff., Ex. C.) Authur Songey, Premier's Chief

Financial Officer, accepted service of the complaint. (Lunseth Aff., Ex. C., Songey Dep. at 36-37.) Songey sent a copy of the summons and complaint to Premier's counsel at the Wilson Sonsini law firm (id.) and to Cohen, who was still Premier's Chairman of the Board (Lunseth Aff., Ex. D at 58). Yet, Premier did not respond to the complaint.

Moreover, on September 25, 2001, after Premier failed to file an answer, Lafeber, plaintiff's attorney, called Davis, defendant's attorney, to advise him that the answer was overdue. (Lafeber Aff., Ex. C at ¶ 6.) Davis admitted that he knew about the complaint, was aware that it had been served on Premier, but would not state whether Premier would be responding. (Id.) Thus, because both Premier and Premier's attorney clearly knew about the complaint but failed to file a timely answer, the court concludes that Premier's failure to file an answer constitutes intentional conduct.

Premier contends that it did not file a timely answer because of Cohen's unexpected and disruptive departure from Premier. Essentially, Premier explains that Advanced's complaint simply "slipped through the cracks" because of Cohen's sudden departure. The record, however, does not support Premier's explanation.[1] Even

---

[1] Cohen was not unexpectedly removed from Premier, as Premier asserts. In fact, Cohen was still a member of Premier's Board of Directors when this motion came before the court. (Lunseth Aff., Ex. B, Nooney Dep. at p.58.) Moreover, Cohen's removal as CEO of (continued...)

assuming that the explanation is true, it does not constitute good cause and thus relieve Premier of its obligation to defend the litigation. See, e.g., Heaton v. Bonacker & Leigh, 173 F.R.D. 533, 535 (M.D. Ala. 1997)("It is not enough to argue that a mail clerk misplaced the complaint, or to contend that the Postal Service lost the complaint.")(citations omitted); see also Florida Physician's Ins. Co. v. Ehlers, 8 F.3d 780, 784 (11th Cir. 1993)("The 'failure [of a company] to establish minimum procedural safeguards for determining that action in response to a summons and complaint is being taken does not constitute default through excusable neglect.'")(quoting Gibbs v. Air Canada, 810 F.2d 1529, 1537 (11th Cir. 1987)); Baez v. S.S. Kresge Co., 518 F.2d 349, 350 (5th Cir. 1975)(denying relief from default judgment and emphasizing that "minimal internal procedural safeguards could and should have been established which would have prevented [the loss of motion papers when sent to defendant's attorney].)" As the district court stated in Heaton, "organizations must have systems "'for checking up on process to see that it has in fact reached its destination and that action is being taken.'" Heaton, 173 F.R.D. at 535 (quoting Gibbs, 810 F.2d at 1537). Because the court finds that Premier's default is the result of intentional conduct, Premier does not satisfy the

---

[1](...continued)
Premier was part of a negotiated private placement financing transaction in which Cohen received a substantial amount of money. (Lunseth Aff., Ex. B, Nooney Dep. at 29-30.)

"good cause" standard for relief under Federal Rule of Civil Procedure 55(c). The court therefore denies Premier's motion for relief from entry of default.[2]

**B. Plaintiff's Rule 55(b)(2) Motion for Entry of Default Judgment**

In the Eighth Circuit, the entry of default judgment is appropriate when a party's conduct includes "'willful violations of court rules, contumacious conduct, or intentional delays.'" Ackra Direct Mktg. Corp. v. Fingerhut Corp., 86 F.3d 852, 855 (8th Cir. 1996)(quoting United States v. Harre, 983 F.2d 128, 130 (8th Cir. 1993)); see Taylor v. City of Ballwin, 859 F.2d 1330, 1332 (8th Cir. 1988)(quoting E.F. Hutton & Co. v. Moffat, 460 F.2d 284, 285 (5th Cir. 1972)); Inman v. American Home Furniture Placement, 120 F.3d 117, 119 (8th Cir. 1997). Default judgment is not an appropriate sanction for a "'marginal failure to comply with time requirements.'" Ackra, 86 F.3d at 855 (quoting Harre, 983 F.2d at

[2] The court need not consider whether Premier has a meritorious defense or whether Advanced would suffer prejudice if the court granted relief from default because the court finds that Premier engaged in culpable conduct. Neuman, 862 F.2d at 1391; Porter, 171 F.R.D. at 304. The court, however, notes that even if the court were to consider those two factors, the court still would have denied Premier's motion for relief from default because the balance would tilt in Advanced's favor.

130). Because the court concludes that defendant engaged in contumacious conduct, the court grants plaintiff's motion for partial default judgment.[3]

While the Eighth Circuit "has not articulated specific factors that must be considered in determining whether a Rule 55(b) motion for default judgment for failure to defend should be granted," Ackra, 86 F.3d at 857, the Ninth Circuit has offered several factors that the court finds instructive. In Alan Neuman Prods., Inc. v. Albright, the Ninth Circuit stated that a default judgment will be upheld if (1) the defendant's culpable conduct led to the default, (2) the defendant has no meritorious defense or (3) the plaintiff would be prejudiced if the judgment were set aside. 862 F.2d at 1391. The court further held that the court need not consider whether defendant established a meritorious defense or whether plaintiff would suffer prejudice if the judgment were set aside when the defendant engaged in culpable conduct. Alan Neuman, 862 F.2d at 1391. The court explained that a "defendant's conduct

[3] The court notes that "a default judgment on well-pleaded allegations establishes only defendant's liability; plaintiff must still establish the extent of damages." Kelley v. Carr, 567 F. Supp. 831, 841 (W.D. Mich. 1983); see Antoine v. Atlas Turner, Inc., 66 F.3d 105, 110 (6th Cir. 1995)("'Where damages are unliquidated a default admits only defendant's liability and the amount of damages must be proved.'")(quoting Fehlhaber v. Fehlhaber, 681 F.2d 1015, 1026 (5th Cir. 1982). Thus, the court grants plaintiff's motion for default judgment on defendant's liability only.

is culpable if he has received actual or constructive notice of the filing of the action and intentionally failed to answer." Id.

In Alan Neuman Prods., Inc., plaintiff's attorney filed a complaint on behalf of plaintiff and attempted to serve defendant personally. Id. at 1390. Defendant advised his attorneys that service was attempted and those attorneys hired another law firm to check the docket for a return of service entry. Id. Plaintiff's attorneys wrote to defendant confirming to him that he had been personally served and told defendant that would file for an entry of default if he did not answer the complaint. Id. After a default was entered, the district court denied defendant's motion to set aside the default. Id. at 1392. The Ninth Circuit affirmed, concluding that it was not clearly erroneous for the district court to find that defendant's intentional failure to appear and to answer the complaint constituted culpable conduct. Id. As evidence of the culpable conduct, the court emphasized that the defendant had actual notice of the complaint, that the defendant's attorneys monitored the court docket and that plaintiff's attorneys corresponded with defendant about the complaint.

Similar to the defendant in Alan Neuman Prods., Inc., and as discussed above, Premier and Premier's attorney certainly knew that Advanced filed the complaint in this action and Advanced's attorney contacted Premier about the complaint and Premier's failure to file

a timely answer. Thus, as in Alan Neuman Prods., Inc., Premier's conduct was contumacious because Premier and Premier's attorneys had actual notice of the complaint, Advanced's attorney communicated to Premier's attorney regarding the complaint and Premier nevertheless failed to file an answer. Because Premier's actions clearly constituted culpable conduct, entry of default judgment is appropriate.[4]

**II. Advanced's Motion to Strike Premier's Answer**

Advanced also moves to strike defendant's answer and counterclaim. Premier does not oppose this motion, conceding that "it violated technical pleading rules by filing a late answer." (Def.'s Opp'n Mot. Default J. at 8 n.4). The court therefore grants Advanced's motion to strike defendant's answer and counterclaim.

**III. Premier's Motion for Leave to File Answer and Counterclaim**

Because the court grants Advanced's motion for entry of default judgment, Premier's motion for leave to file an answer and counterclaim is moot. The court therefore denies that motion as moot.

---

[4] As discussed, because the court finds culpable conduct, the court need not consider whether Premier has a meritorious defense or whether Advanced would suffer prejudice if the judgment were set aside. Neuman, 862 F.2d at 1391; Porter, 171 F.R.D. at 304.

## IV. Advanced's Motion for A Preliminary Injunction

Finally, Advanced brings a motion for a preliminary injunction until Advanced is able to establish its monetary damages. The grant or denial of a preliminary injunction is within the discretion of the district court. Amazon.com. Inc. v. Barnesandnoble.com, Inc., 239 F.3d 1343, 1350 (Fed. Cir. 2001). As the moving party, Advanced is entitled to a preliminary injunction if it can succeed in showing (1) a reasonable likelihood of success on the merits, (2) irreparable harm if an injunction is not granted, (3) a balance of hardships tipping in its favor and (4) the injunction's favorable impact on the public interest. See, e.g., id.; Purdue Pharma L.P. v. Boehringer Ingelheim GmbH, 237 F.3d 1359, 1363 (Fed. Cir. 2001). None of these factors is dispositive. Amazon.com. Inc. v. Barnesandnoble.com, Inc., 239 F.3d at 1350. Rather, the court weighs each factor against the others and against the form and magnitude of the relief sought. Id. (quoting Hybritech, Inc. v. Abbott Labs., 849 F.2d 1446, 1451 (Fed. Cir. 1988)). Based on an analysis of all four factors, the court grants plaintiff's motion for a preliminary injunction.

### A. Likelihood of Success on the Merits

To establish the likelihood of success on the merits, Advanced must show that, in light of the presumptions and burdens that will inhere at a trial on the merits, (1) Advanced's infringement claim will likely withstand Premier's challenges to the validity and the

enforceability of the patent and (2) Advanced will likely prove that defendant infringes upon its patent. Vehicular Tech. Corp., 141 F.3d at 1088. Advanced has satisfied this burden.

**a. Advanced has a Valid Patent**

35 U.S.C. § 282 states that a "patent is presumed valid" and that "the burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." The presumption of validity exists at every stage of the litigation. Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc., 134 F.3d 1085, 1088 (Fed. Cir. 1998). "[W]here the challenger fails to identify any persuasive evidence of invalidity, the very existence of the patent satisfies the patentee's burden on the validity issue." Id. Here, Premier has not provided clear and convincing evidence of the invalidity of the '908 patent. The patent is therefore presumed valid.

**b. Infringement**

On a motion for entry of default judgment, allegations of fact in the complaint are taken as true unless they are contradictory on the document's face. Kelley, 567 F. Supp. at 840. Because the court entered default judgment, Premier is deemed to have admitted each and every factual allegation of infringement set out in the complaint. Thus, through the default judgment, Advanced has established infringement.

Even aside from the default judgment, Advanced has provided sufficient evidence of infringement. A product infringes upon a patent if it contains every limitation of any one claim or an equivalent of each limitation not literally met. Dolly, Inc. v. Spaulding & Evenflo Cos., Inc., 16 F.3d 394, 397 (Fed. Cir. 1994); Becton Dickinson & Co. v. C.R. Bard, Inc., 922 F.2d 792, 796 (Fed. Cir. 1990). An infringement analysis requires two steps. The first is to construe the meaning and the scope of the patent claims, a step commonly referred to as claim construction. Southwall Tech. Inc. v. Cardinal IG Co., 54 F.3d 1570, 1575 (Fed. Cir. 1995). The second is to determine whether the accused invention infringes upon the patent claim as construed. Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995). While the first step is solely a question of law to be determined by the court, the second step is one for the trier of fact. Purdue, 237 F.3d at 1363; Cybor Corp. v. FAS Tech., Inc., 138 F.3d 1448, 1454 (Fed. Cir. 1998)(*en banc*).

**(1) Claim Construction of the '908 Patent**

Claim construction involves ascertaining the true meaning and scope of each claim as a matter of law. See Markman v. Westview Instruments, Inc., 517 U.S. 370, 386 (1996). In determining the meaning of the terms of a claim, the court considers "intrinsic" evidence, which consists of the language of the claims, the specification of the patent and the prosecution history. See

Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). If the meaning of the claim terms is not ambiguous and can be determined from the intrinsic evidence, the court need not rely on extrinsic evidence in rendering its claim construction. See id. at 1583. Courts should give the words of a claim their ordinary and accustomed meaning, unless it appears that the inventor used them differently. See ZMI Corp. v. Cardiac Resuscitator Corp., 844 F.2d 1576, 1579 (Fed. Cir. 1988).

Here, the parties contest whether Premier infringes upon claim 1 of the '908 patent. Claim 1 of the '908 Patent reads as follows:

> 1. A multi-station video/audio distribution apparatus that allows a plurality of users to simultaneously sample different video material and audio material, comprising:
>
> (a) at least two preview stations, said at least two preview stations each having a user input, an audio output such that an analog audio signal corresponding to said user input may be heard, and a video display such that video material corresponding to said user input may be seen;
>
> (b) data control means, said data control means for retrieving digitized video material corresponding to each of said user inputs;
>
> (c) preview station interface means, said preview station interface means separate from and directly connected to said data control means and said at least two preview stations by non-switched connections not involving a local area network or wide area network, said preview station interface means for transferring each of said user inputs from its respective preview station to aid data control means, for receiving each of said digitized audio material corresponding to each of said

> user inputs, for converting each of said digitized audio materials to said analog audio signal and for transferring each of said analog audio signal to its respective preview station; and
>
> (d) video display interface means, said video display interface means separate from and directly connected to said control means and said video display by connections not involving a local area network or wide area network, said video display interface means for receiving each of said digitized video materials corresponding to each of said user inputs, for converting each of said digitized video materials to a format acceptable to said video display, and for transferring said formatted video materials to said video display.

(Helget Aff., Ex. A, Col. 8, lns. 14-48.) The parties dispute the construction of particular terms in elements (b), (c) and (d) of the '908 patent. These terms therefore require construction.

**(a) Element (b) of the '908 patent**

The parties dispute the term "data control means" in element (b) of the '908 patent. Both parties agree that the "data control means" is in a means-plus-function format. (See Def. Opp. Mot. Prelim. Injun. at 13; P's Reply Mem. Supp. Mot. Prelim. Injun. at 3) Whether a claim limitation is in means-plus-function format is a matter of claim construction and is thus a question of law. See Kemco Sales, Inc. v. Control Papers Co., Inc., 208 F.3d 1352, 1360 (Fed. Cir. 2000). Title 35 § 112, ¶ 6 provides that a patentee may define the structure for performing a particular function generically through the use of a means expression, provided however

that it discloses specific structure corresponding to that means in the patent specification. See 35 U.S.C. § 112, ¶ 6;[5] see also Valmont Indus., Inc. v. Reinke Mfg. Co., Inc., 983 F.2d 1039, 1042 (Fed. Cir. 1993) (explaining that the patent applicant must describe in the specification some structure which performs the specified function recited in the claim limitation). The Federal Circuit has referred to § 112, ¶ 6 as embodying a statutory "quid pro quo" since the duty to link or associate structure to function is exchanged for the convenience of utilizing § 112, ¶ 6; see Kemco, 208 F.3d at 1360; B. Braun Medical, Inc. v. Abbott Labs., 124 F.3d 1419, 1424 (Fed. Cir. 1997).

Once a court establishes that a means-plus-function limitation is at issue, it must construe that limitation to determine what the claimed function is and what structure is disclosed in the written specification that corresponds to the "means" for performing that function. Kemco, 208 F.3d at 1360; Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc., 145 F.3d 1303, 1308 (Fed. Cir. 1998) (after establishing that a means-plus-function limitation is at

---

[5] Section 112, ¶ 6 specifically provides:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112 (2000).

issue, the district court must construe the function recited and determine what structure has been disclosed in the specification that corresponds for performing that function); Odetics, Inc. v. Storage Tech. Corp., 185 F.3d 1259, 1264 (Fed. Cir. 1999) (claim limitations written as means-plus-function limitations pursuant to 35 U.S.C. § 112, ¶ 6 must be construed to cover the structure described in the patent specification for accomplishing the recited function and any equivalents thereof). A court, however, may not import functional limitations that are not recited in the claim or structural limitations from the written description that are unnecessary to perform the claimed function. Wenger Mfg., Inc. v. Coating Mach. Sys., Inc., 239 F.3d 1225, 1233 (Fed. Cir. 2001).

Use of the term "means" in a claim limitation creates a presumption that § 112, ¶ 6 has been invoked, but that presumption may be rebutted if the properly construed claim limitation itself recites sufficiently definite structure to perform the claimed function. See Kemco, 208 F.3d at 1360-61. Conversely, absence of the word "means" creates a presumption that § 112, ¶ 6 has not been invoked, but that presumption may likewise be rebutted if the claim limitation is determined not to recite sufficiently definite structure to perform the claimed function. See id. Because both parties agree that the term "data control means" is in a means-plus-function format and because the term uses the word "means," the court construes the term accordingly.

The proper construction of a means-plus-function claim includes all alternatives that perform the same function with the same or equivalent structures. Carroll Touch, Inc. v. Electro Mechanical Sys., Inc., 27 USPQ2d 1836, 1840-41 (Fed. Cir. 1993). Here, the language of the claim 1, element (b) makes clear that the function set forth in the claimed "data control means" is "retrieving digitized audio and digitized video material." (Helget Aff., Ex. A, Col. 8, lns. 24-25.) The structure set forth in the '908 patent specification for carrying out this function is provided at col. 3, line 64 to col. 4 line 17. The structure includes "file management utilities" and "data files stored on internal or external hard drives." (Helget Aff., Ex. A, Col. 4, lns. 7, 12-13.)

**(b) Element (c) and (d)**

**(i) "directly connected"**

The parties also contest the construction of "directly connected." Premier asserts that "directly connected" means "joined by a single wire without deviation." (Def. Opp. Mot. Prelim. Injun. at 11.) Advanced contends that Premier's reading of that term is too narrow. As discussed, there is a hierarchy to the evidence to be considered in claim construction: the claim language first, then the patent specification and finally the file history. Vitronics, 90 F.3d at 1582-85. Based upon the claim's language, the specification and the prosecution history, the court construes

the term "directly connected" to mean connected by non-switched connections not involving a local area network or wide area network.

The plain language of the claim supports this understanding of "directly connected." The relevant portion of element (c) reads: "preview station means, said preview station interface means separate from and directly connected to said data control means and said at least two preview stations by non-switched connections not involving a local area network or wide area network." (Helget Aff., Ex. A, Col. 8, lns. 25-31.) The patent language itself therefore defines the term "directly connected" to mean connected "by non-switched connections not involving a local area network or wide area network."

The specification also supports that definition of "directly connected." The specification language emphasizes that the term is used to distinguish the claim from an implementation which would use a preview station microcontroller to process the video data. The specification provides: "The video display 80 does not transfer data or information through the preview station microcontroller 26 but rather is directly connected to a video display interface means 82 through a high gauge wire 83 having RC connectors at either end." (Helget Aff., Ex. A, Col. 5, Ln. 65- Col 6 Ln 2.) The specification does not state that "directly connected" means only connected by a single wire, as Premier asserts. Such an

understanding would erroneously read the limitations of a particular embodiment into the claim language. Instead, the specification provides that "[t]he present invention may be embodied in other specific forms without departing from the spirit of the essential attributes thereof...." (Helget Aff., Ex. A, Col. 8, Lns. 6-12.)

Moreover, the prosecution history supports the court's construction of "directly connected" and undermines Premier's construction. During prosecution, Advanced argued that "direct connections do not involve switching software and hardware like a local area network." (Tolliver Decl., Ex. K at 3.) Although "directly connected" was added during prosecution, the words were added to distinguish this patent from a prior art that showed a LAN between the display device and the server. (Tolliver Decl., Ex. I at 10, 12; K at 2-5.) The words were not added to narrow claim 1 to a single wire implementation.

**(ii) Local Area Network**

The parties further dispute the construction of the term "local area network." The court construes the term "local area network" to be a network involving switching hardware or software. The language of element (c) provides for "preview station interface means, said preview station interface means separate from and directly connected to said data control means and said at least two preview stations by non-switched connections not involving a local

area network." (Helget Aff., Ex. A, Col. 8, Lns. 26-30.) From this language, it is clear that the '908 patent does not include a LAN and that claim 1 defines a LAN to be switched connections. The prosecution history further makes clear that "[a]ny local area network, by definition, is switched, not non-switched." (Tolliver Dec., Ex. K at 3.) It emphasizes that a local area network includes "switching hardware and software." (Tolliver Dec., Ex. K at 3.) The fact that Premier does not favor a broad definition of LAN does not mean that Premier can construe the term more narrowly to its own advantage. The language of the patent and the prosecution history are binding. The court therefore construes the term "local area network" to involve a network that switches hardware and software, a construction that is consistent with both the patent language and the prosecution history.

**(2) Infringement**

After the claims are construed as a matter of law, the court must consider whether "a reasonable trier of fact could find that every limitation in any construed claim at issue" may be found in the accused devise. Unidynamics Corp. v. Automatic Products Int'l, Ltd., 157 F.3d 1311, 1316-17 (Fed. Cir. 1998). Infringement of a claim occurs when every limitation recited in the claim appears in the accused devise. DeMarini Sports Inc. v. Worth, Inc., 239 F.3d 1314, 1331 (Fed. Cir. 2001) (quoting Amhil Enters., Ltd. v. Wawa, Inc., 81 F.3d 1554, 1562 (Fed. Cir. 1996)); Dolly, Inc., 16 F.3d at

397 (an accused device must include every claim limitation of the claim). If just one limitation is missing or is not met as claimed, there is no infringement. London v. Carson Pirie Scott & Co., 946 F.2d 1534, 1539 (Fed. Cir. 1991); Mas-Hamilton Group v. La Gard, Inc., 156 F.3d 1206, 1211 (Fed. Cir. 1998).

The court concludes that Advanced has shown a likelihood of success on its infringement claim. Premier does not contest that the Interactive Network reads on Claim 1(a) of the '908 patent. The Interactive Network has at least two preview stations, each of which has a user input, an audio output such that an analog signal corresponding to the user input may be heard and a video display such that material corresponding to the user input may be seen. (Helget Aff., Ex. B.)

The Interactive Network also reads on Claim 1(b) of the '908 patent. The Interactive Network has a server which performs the identical function of the claimed "data control means." It retrieves digitized audio and digitized video signals using limited file information corresponding to product bar codes stored in the computer's memory. (Kyte Aff. at ¶ 6.) The server also has the identical structure of the claimed "data control means," namely a standard computer platform with microprocessor, random access memory, interfaces to various peripherals such as disk drives, operating system software, file management utilities, application software and high-speed random access storage of audio and/or video

material in digital form, contained in data files stored on internal or external hard drives. (See Helget Aff., Ex. B.)

The Interactive Network reads on Claim 1(c) and (d) of the '908 patent. While Premier states that the Interactive Network does not read on Claim 1(c) and (d) because it is not "directly connected," the court finds Premier's argument unpersuasive, especially given the erroneously narrow construction Premier provides for the term "directly connected." Each version of Premier's Interactive Network is "directly connected" as the term is defined by the '908 patent and the prosecution history.

Moreover, while Premier states that the Interactive Network Version 1.0 and 3.0 do not read upon Claim 1(c) and (d) because each uses a LAN to make connections between the circuit board and the preview station or television,[6] Premier errs in its narrow analysis of the term "LAN." The implementation included in Version 1.0 that Premier describes in the Kyte affidavit does not involve switching hardware and software and thus is not a LAN. Similarly, while Premier asserts that audio files are delivered via LAN in Version 3.0, the court finds the assertion unpersuasive given Advanced's definition of the term LAN. Thus, the court concludes that Advanced has established a likelihood of success on the merits.

---

[6] Premier never asserts that Version 2.0 uses a LAN.

**B. Irreparable Harm**

"[A] presumption of irreparable harm arises when a patentee makes a clear showing that a patent is valid and that it is infringed." High Tech. Med. Instrumentation, Inc. v. New Image Indus., Inc., 49 F.3d 1551, 1556 (Fed. Cir. 1995). Because Advanced has established that it has a valid and enforceable patent and that its patent has been infringed, Advanced is entitled to a presumption of irreparable harm. The fact that Advanced offered to enter into a licensing agreement with Premier does not rebut the presumption of irreparable harm. See Aero Indus., Inc. v. John Donovan Enterprises-Florida, Inc., 80 F. Supp. 2d 963, 977 (S.D. Ind. 1999)(finding that the fact that movant for preliminary injunction entered into discussions with defendant about possible licensing of the allegedly infringed patent did not rebut the presumption of irreparable harm).

**C. Balance of Hardships**

The balance of hardships favors Advanced. In this case, the economic harm posed to Advanced by the unlicensed production and sale of the Interactive Network is obvious and the court finds that any harm to defendant pales in comparison.

**D. Public Policy**

There is a strong public interest in protecting the rights secured by patents. Smith Int'l, Inc. v. Hughes Tool Co., 718 F.2d

1573, 1581 (Fed. Cir. 1983.) Thus, the public interest weighs in favor of granting a preliminary injunction in this case.

**E. Bond**

Under Federal Rule 65(c), the court is required to determine the amount of security that the preliminary injunction movant must give "for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined." The court concludes that a bond of $25,000 is appropriate in this case.

**CONCLUSION**

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

1. Plaintiff's motion for partial default judgment [Docket No. 7] is granted;

2. Defendant's motion for relief from default [Docket No. 19] is denied;

3. Defendant's motion for leave to file an answer and counterclaim [Docket No. 19] is denied;

4. Plaintiff's motion to strike defendant's answer and counterclaim [Docket No. 13] is granted;

5. Plaintiff's motion for a preliminary injunction [Docket No. 7] is granted; and

6. Pursuant to Federal Rule 65(c), this injunction will not take effect until plaintiff posts a bond or provides other security in the amount of $25,000.

Dated: February 21, 2002

David S. Doty, Judge
United States District Court